# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

**JOHN W. JEFFRIES,**
      **Plaintiff,**

**vs.**                    **Case No.: 3:06cv344/MCR/MD**

**JAMES EDWARD SULLIVAN, et al.,**
      **Defendants.**

---

## REPORT AND RECOMMENDATION

      This case filed pursuant to 42 U.S.C. § 1983 arises out of plaintiff John W. Jeffries' arrest and detention at the Escambia County Jail ("Jail"). Plaintiff, a state prisoner proceeding *pro se* and *in forma pauperis*,[1] claims that an Escambia County Deputy Sheriff violated his Fourth and Fourteenth Amendment rights under the United States Constitution when he used excessive force in effecting plaintiff's arrest; that another deputy sheriff failed to intervene and in fact assisted in the assault; and that the alleged beating resulted in, or contributed to, plaintiff's lung collapsing. Plaintiff further claims that while confined as a pre-trial detainee at the Jail, housing and medical staff deprived him of his constitutional right to adequate medical care for the collapsed lung. As relief, plaintiff seeks monetary damages and injunctive relief. Pending before the court are defendants' motions for summary

---

[1] Court records reflect that as of January 22, 2008 plaintiff had paid $346.00 toward the $350.00 filing fee; therefore, as of that date he still owed $4.00 to the court.

judgment.  (Docs. 71, 72, 73, 109, 110, 117).[2]  Plaintiff has responded in opposition to the motions.  (Docs. 74, 111, 118).[3]

## FACTUAL BACKGROUND

<u>Plaintiff's Arrest</u>

In plaintiff's verified amended complaint (doc. 9) and responses to defendants' motions for summary judgment (docs. 69, 101),[4] plaintiff alleges that on January 1, 2004 he was detained by Escambia County Deputy Sheriffs James Edward Sullivan ("defendant Sullivan") and Charles Dix ("defendant Dix"), who were investigating the appropriation of a stolen vehicle by a person fitting plaintiff's description. Defendants Sullivan and Dix arrived at a house on Blount Street, asking for "the tall white guy in a green shirt."  (Doc. 9, Statement of Facts, p. 7).[5]  Plaintiff presented himself and told the deputies that he would go with them.  Once outside the house, defendant Sullivan told plaintiff he was going to handcuff him for his (plaintiff's) own safety, but that plaintiff was not under arrest.  Defendant Sullivan then cuffed plaintiff's hands behind his back.  (*Id.*).  Sullivan and Dix escorted plaintiff to the right of the house (when facing out the door of the house) to a dark area where a squad car was parked.  There was another squad car directly in front of the house approximately 20-30 feet from the front door.

---

[2]Defendants' motions for summary judgment appear on the docket as docs. 71, 72, 73, 109, 110 and 117.  However, the actual document images appear at docs. 51, 55, 57, 80, 81 and 113, respectively.  For ease of reference, all citations to the motions will be to their document images.

[3]Plaintiff's responses to the motions for summary judgment appear on the docket as docs. 74, 111 and 118.  For ease of reference, all citations to the responses will be to their document images: docs. 69, 101 and 115, respectively.

[4]Because these responses are sworn under penalty of perjury, the court considers them affidavits to the extent they set forth facts (which would be admissible as evidence) that are based on plaintiff's personal knowledge.  *See* Fed.R.Civ.P. 56(e).  The court does not consider plaintiff's third response (doc. 118) an affidavit.

[5]The court has numbered the additional pages attached to plaintiff's Statement of Facts as pages 7A through 7G.

Defendant Sullivan asked plaintiff what he knew about a white Dodge pickup truck that had been stolen from Panama City.  (*Id.*).  Plaintiff replied that he had no knowledge of a stolen truck.  Defendant Dix then grabbed plaintiff's hands from behind using the cuffs as a handle, and pulled plaintiff's arms over the open rear door of the squad car.  This caused plaintiff to bend backwards with the contour of the door.  Plaintiff was on one side of the door; Dix was on the other side of the door holding plaintiff's hands; and Sullivan was standing in front of plaintiff.  At that time, defendant Sullivan slapped plaintiff in the face and asked plaintiff, "Where did you steal the truck?"  Plaintiff responded that he had no knowledge of a stolen truck.  Sullivan then took his Brinkman flashlight, held it by the lens portion, and struck plaintiff in the diaphragm and sternum area of his chest with the flashlight.  Sullivan did not swing the flashlight like a baseball bat; rather, he thrust it like a sword into and up under plaintiff's rib cage.  (*Id.*, pp. 7-7A).  Defendant Sullivan was a large man, appearing to plaintiff to weigh approximately 250 lbs.  (*Id.*, p. 7A).  Defendant Sullivan struck plaintiff so hard it took a few minutes for plaintiff to regain his composure and catch his breath.  Sullivan asked plaintiff again about the stolen vehicle, to which plaintiff responded, "I have nothing to say to you, Sir."  Defendant Dix, still holding plaintiff's arms, stated "Your [sic] going to tell us, believe me you'll tell."  Defendant Sullivan then struck plaintiff again in the same manner as before.  Sullivan continued to strike plaintiff while both men at times laughed and said, "Your [sic] a dumb M ___ F___er aren't you," and at other times asked about the stolen vehicle. They also stated, "You don't know who we are do ya' boy?  We run this part of town and your [sic] going to tell us about that truck or we're going to beat you until you do."  This beating and questioning continued for approximately one hour. Plaintiff was struck 25-30 times with the flashlight in the manner just described. (*Id.*, p. 7A).

Plaintiff was then escorted to the front of the house and placed in the back of a squad car.  Two young men were in the back of the car, Shelton Harris and Justin Hestle.  Plaintiff had loaned the two men the truck, and it was upon their being pulled

over for a traffic stop that deputies learned the truck was stolen.  (Doc. 69, p. 27).
Harris and Hestle had been transported in the squad car to the Blount Street house.
When plaintiff entered the back of the car with Harris and Hestle, he confessed that
he had stolen the truck, that he had loaned it to Harris and Hestle, and that Harris
and Hestle had not known it was stolen.  (Doc. 9, p. 7A; doc. 69, p. 27).  Plaintiff
states that his confession was "given freely so as not to have two innocent men
incarcerated," and was not a result of the beating.  (Doc. 69, p. 27). Plaintiff states
that his incarceration has prevented him from obtaining affidavits from Harris and
Hestle.  (*Id.*).

Plaintiff was then placed under arrest and secured in the squad car.  During
this time the deputies asked plaintiff his name, where he got the vehicle, and
"basically all the particulars to their case."  (*Id.*, p. 7A).  They then transported
plaintiff to the Jail and booked him on a charge of Grand Theft Auto.  Plaintiff
emphasizes that he is guilty of stealing the truck, that he was convicted of the
offense, and that he does not challenge the conviction. (*Id.*).[6]  During transport, the
deputies warned plaintiff that the Jail was run by the Sheriff's Department and that
if plaintiff opened his mouth about the assault he would receive a worse beating
than he already received.  Plaintiff was booked into the Jail in the early morning
hours of January 2, 2004.

Plaintiff states that at no time did he attempt to run, offer violence, verbally
abuse the deputies, or resist arrest, and that "notwithstanding failing to confess,
[he] complied with every instruction given [him] by these officers."  (*Id.*, p. 7B).
Plaintiff avers that he was "cordial and compliant" with the deputies, and "followed
their every instruction."  (Doc. 69, p. 20).  Plaintiff further states that he was not in
possession of any weapons or drugs at the time of his arrest.  (Doc. 9, p. 7B).

---

[6]It is undisputed that plaintiff was charged in the Escambia County Circuit Court with Grand
Theft of a Motor Vehicle.  Plaintiff pleaded guilty to, and was convicted of, the offense as charged.
(Doc. 58, ex. D, Judgment in case number 04-0076; *see also* www.clerk.co.escambia.fl.us, case
number 2004 CF 000076 A).

According to plaintiff, the deputies' assault resulted in, or contributed to, his lung collapsing approximately 18 days later while he was confined as a pre-trial detainee at the Jail. (Doc. 69, p. 20).[7]

Plaintiff's Medical Care at the Jail

Plaintiff alleges that on January 19, 2004, while being held as a pre-trial detainee at the Jail, his right lung collapsed either as a direct result of, or as a result of complications arising from, the assault by defendants Sullivan and Dix. At approximately 2:00 a.m. on January 19, 2004 plaintiff was awakened from sleep by intense pain in his chest and severe shortness of breath. (Doc. 9, p. 7B). Plaintiff reported to defendant dormitory officer Robert White: "I . . . can't . . . breathe . . . I . . . have . . . a . . . medical . . . emergency." (Id.). Plaintiff had to stand with his arms over his head, and his breathing "resembled that of a 'panting dog,' very shallow, rapid, short breaths." (Id.). Plaintiff could barely speak because he could not get enough air into his lungs to vocalize sounds. Plaintiff was in extreme pain. Defendant White called medical staff, who responded within ten minutes.

Defendants Stephanie Clark and Annie Adams responded to the call, as well as a female Jail officer. (Id.). Upon their arrival plaintiff was standing with both arms raised over his head, leaning against the wall and gasping for air. His breathing

---

[7]In support of his version of events, plaintiff relies on portions of the Escambia County Sheriff's Office Internal Affairs Report provided by defendants Sullivan and Dix, specifically: (1) plaintiff's recorded statement made during the course of the Internal Affairs Investigation (doc. 58, ex. A, part 2a, pp. 28-45 and part 2b, pp. 1-7); (2) the Escambia County Sheriff's Office call history record (doc. 58, ex. A, part 1a, pp. 19- 21); and (3) the Escambia County Sheriff's Office offense report relating to plaintiff's arrest, Report Number ESCO04OFF000088 (doc. 58, ex. A, part 1a, pp. 22-28). Plaintiff states these documents do not dispute (and in fact support) his contention that he was in the sole, unsupervised custody of defendants Sullivan and Dix at the Blount Street house for 30-40 minutes (from around midnight on January 1, 2004 until approximately 12:35 a.m. on January 2, 2004 at which time the call history record shows his transport to the Jail), during which time he was outside the view of other deputies on the scene (and apparently believed by them to have already been transported to the Jail) (doc. 69, pp. 21, 25); that no deputies on the scene or documents submitted by defendants account for this 30 to 40-minute period; that plaintiff was cordial, compliant and cooperative to Sullivan and Dix (doc. 58, ex. A, part 2b, p. 13); that the Sacred Heart Triage Assessment confirms that he reported having been hit in the rib area with a flashlight on January 2, 2004 (doc. 58, ex. A., part 1b, p. 25; doc. 69, p. 28); that plaintiff's medical records from PHS show evidence of a healed fracture of the second left rib, and that plaintiff has never had a broken rib prior to the assault by Sullivan.

resembled the panting previously described, but was even more rapid as plaintiff was beginning to panic. Plaintiff could not catch his breath and feared he was going to die. (*Id.*). Clark or Adams asked plaintiff, "What's the matter? Can't you breathe?" Plaintiff shook his head in the negative. He reported that prior to this episode, he had been awakened from sleep with similar pain in his chest, but that it had subsided. Clark took plaintiff's vital signs and reported a respiration rate of 24 breaths (per minute), a pulse rate of 110 beats (per minute), and a blood pressure reading of 120/70. (Doc. 52, ex. D, p. 2 ¶ 10; doc. 52, ex. C, p. 25).

Clark and Adams told plaintiff he was hyperventilating and, after finding a paper bag, instructed plaintiff to hold the bag over his nose and mouth and breathe in and out slowly. Plaintiff complied and after 10-20 seconds, lost consciousness and fell to the floor. After reviving plaintiff, Clark and Adams assisted plaintiff in regaining the posture where he could get air. They advised plaintiff that he may be having a heart attack and that he was going to be taken to the Jail infirmary. (Doc. 9, pp. 7B-7C). Clark and Adams attempted to place plaintiff in a wheelchair and also placed a portable oxygen mask over his face. However, when plaintiff sat down he was again completely unable to breathe, and immediately stood up and resumed his posture of standing with his arms over his head. (*Id.*, p. 7C). Clark or Adams asked plaintiff if he could make it to the elevator. Plaintiff nodded affirmatively. Plaintiff walked to the elevator with his arms over his head, as this was the only way he could maintain his breathing.

Upon arrival at the medical department, plaintiff was informed by Clark and Adams that they were going to administer an EKG test to see if plaintiff was having a heart attack. (*Id.*, p. 7C). Plaintiff was unable to lie down, and remained seated with his hands over his head. They attached the wires and ran the test. Plaintiff was then left alone for approximately five minutes. (*Id.*).

When defendants Clark and Adams returned, they were holding sodas from the break room. They informed plaintiff that he had gas, and gave him an antacid. Plaintiff asked to see a doctor. Clark and/or Adams responded, "Do you think we

can afford to have a doctor available 24 hours a day?  Its 2:30 in the morning.  We don't have a doctor.  You'll be OK when the pill we gave you takes effect."  (*Id.*, p. 7C).  Plaintiff stated, "I . . . don't . . . think . . . this . . . is . . . gas. . . .It hurts . . . in . . . here," and pointed to his chest.  Clark and Adams told plaintiff to show them by holding up fingers on a scale of 1 to 10 how badly it hurt, 10 being the worst pain he had ever experienced.  Plaintiff held up 10 fingers.  Clark and/or Adams responded, "We're not giving you any pain medication - we just don't do that," suggesting that plaintiff wanted medication for reasons other than pain.  (*Id.*).  After approximately one hour, plaintiff experienced some relief from the chest pain and shortness of breath.  (Doc. 69, pp. 14-15; doc. 101, pp. 8-9; *see also* doc. 56, ex. 1A, part 2, pp. 8, 11).  Upon inquiry by defendant Clark, plaintiff indicated he would return to his dormitory.  According to plaintiff, he agreed to return because it was apparent that no further diagnostic procedures or treatments would be provided, and it had been made clear to him that no physician was available or would be made available.  (Doc. 101, p. 9).  Clark noted in plaintiff's medical record that his condition was "fair," and escorted him out of the medical department even though plaintiff was still complaining of cramping in his chest, still experiencing shortness of breath, was unable to complete whole sentences without gasping for air, and still had to maintain the unusual posture of raising his arms over his head in order to breathe.  (Doc. 9, p. 7D; doc. 52, ex. C, p. 25; doc. 101, p. 8).  Clark, Adams and plaintiff were joined in the hallway by the female Jail officer.  As plaintiff walked to the elevator, he had to stop and catch his breath every few feet.  Plaintiff overheard the female Jail officer say to Clark and Adams, "He doesn't look so good.  Do you think we should get him to the hospital?"  (Doc. 9, p. 7D).  Clark or Adams responded, "He probably should go, but I'm not signing anything that's going to cost that kind of money."  (*Id.*, p. 7D).  They then voiced joint concern along the lines of "you know how they are about that."

After plaintiff, Clark, Adams and the female Jail officer arrived back at plaintiff's dormitory, defendant dormitory officer Robert White asked, "Is he going

to die on me?"  Clark and Adams responded, "He has gas, we gave him a pill."
White said, "It doesn't look like he has gas.  He looks like he's going to drop dead."
Clark and Adams responded, "We gave him a pill.  When it takes effect he should be
a lot better."  Clark and Adams departed.

Plaintiff was still standing with his arms raised over his head, leaning on the
wall near the Officer's Desk.  Defendant White informed plaintiff that he couldn't
stand there and directed him to go back to his bunk.  Plaintiff went back to his bunk
and attempted to lie down, but was again unable to breathe.  During this time, the
female Jail officer left.  Plaintiff returned to defendant White and stated, "I . . . can't
. . . breathe."  White responded, "You can sit at the table or stand, just go back over
there," pointing toward the bunk area.  (*Id.*, p. 7D).

Plaintiff sat at the table, arms overhead, gasping for air.  (*Id.*, p. 7E).  A little
while later another inmate brought plaintiff his pillow and spoke to defendant White,
something to the effect of "He's dying."  White told the inmate that plaintiff would be
okay after the pill took effect, and ordered the inmate back to his bunk.  Plaintiff was
left in this posture – arms overhead and gasping for air – for hours.  In the early
morning hours prior to breakfast, plaintiff lost consciousness 2-3 times and twice
fell off his seat at the table.  He was helped back to his seat by other inmates.  (*Id.*,
p. 7E).

During breakfast, other inmates repeatedly told defendant White that plaintiff
needed help, that he was dying, and that he was turning blue.  White responded that
plaintiff would be okay after his medicine took effect.  This was 2-3 hours after
plaintiff took the antacid.  After breakfast, the inmates began to yell at defendant
White that plaintiff was dying and needed to go to the hospital.  Defendant White
stood up, told everyone to "shut up," and stated, "I don't give a f___ if he drops
dead.  Its going to remain quiet in here."  (*Id.*, p. 7E).  He then shook his head and sat
down to his computer terminal.  By 10:00 a.m. plaintiff had been holding his arms
over his head for approximately eight hours, and was exhausted.  Maintaining that
posture became difficult, and plaintiff sat at the table going in and out of

consciousness or on the verge of unconsciousness.  Finally, plaintiff fell face first onto the table.  Other inmates came to help.  They held plaintiff's arms up for him so he could breathe.  At approximately 10:30 a.m., plaintiff was escorted back to the medical department.  (Doc. 113, White Aff., p. 8).

Upon his arrival at the infirmary, plaintiff was immediately diagnosed with a pneumothorax (collapsed lung).  He was reconnected to an oxygen mask, and his blood oxygen level was monitored by a probe on his finger.  (Doc. 9, p. 7E).  While awaiting transport to Sacred Heart Hospital in Pensacola, the Jail doctor began instructing medical staff on the proper techniques for diagnosing a breathing ailment, using plaintiff as an example.  He placed a stethoscope on plaintiff's chest and had staff listen, stating, "No, listen here.  See?  There are no breathing sounds on the right side.  Now listen to the left."  He went on to say, "You must always remember you're A, B, C's - Airway, Breathing, Cardiovascular system.  Without these A, B, C's life cannot be supported."  (*Id.*, p. 7F).  The doctor also stated that plaintiff's injury was more than serious, it was life-threatening and would require immediate surgical intervention.  Plaintiff states it was "painfully obvious these medical staff . . . had little or no training."  (*Id.*).

At 11:42 a.m., plaintiff was transported to the Emergency Room of Sacred Heart Hospital.  (Doc. 52, ex. C, pp. 24, 25).  His triage assessment indicates sharp pain in the right side of his chest with a pain level of 10 (using numeric pain scoring) and difficulty breathing, with more trouble when lying down.  (*Id.*, p. 25).  Plaintiff's vital signs were as follows:  respiration rate of 20, pulse of 72, and blood pressure of 117/77.  (*Id.*, p. 25).  Plaintiff was later seen by a doctor who reviewed his vital signs, noting that plaintiff's oxygen saturation was within normal ranges, that plaintiff had an increased respiratory rate, that plaintiff appeared to be in respiratory distress, and that his chest was "absent right breath sounds."  (*Id.*, p. 26).  The doctor gave plaintiff a shot of Demerol, took a scalpel and inserted it in between plaintiff's second and third rib, and inserted a chest tube, commenting to plaintiff that this procedure was usually done in the operating room, but in plaintiff's case

there was no time.  The procedure was very painful.  After the procedure, the surgeon advised plaintiff that he had just saved his life.  (*Id.*, p. 7F).  A chest x-ray was taken which revealed re-expansion of the right lung.  (*Id.*).  Plaintiff was later seen by the attending physician, William Shanahan, M.D., who diagnosed plaintiff with a complete, tension right pneumothorax.  (Doc. 9, p. 7F; doc. 52, ex. C, pp. 9, 11-12).

Plaintiff was hospitalized for eleven days following the surgery.  During that time he was guarded by the same female Jail officer who had responded with Clark and Adams to plaintiff's initial medical emergency.  She told plaintiff that "she knew something was seriously wrong with [him], that it was impossible not to know," but that when she spoke to Defendant White about her concern he told her, "Let it alone. Its medical's call.  Let them deal with it."  (*Id.*, p. 7G).  She then apologized for not being able to do more to help plaintiff.[8]

---

[8]Plaintiff also asserts that the female Jail officer stated to him that Prison Health Services has a custom of providing only "skeleton crews" on the night shift, and the least expensive services to inmates.  In addition, she stated that there were many other instances where inmates had been misdiagnosed, ignored, or just plain forgotten about, and that some of them had died.  (*Id.*, p. 7G). The court is mindful of the standard regarding the consideration of hearsay statements included in verified pleadings, affidavits, documents, and other materials submitted pursuant to Rule 56.  The general rule is that inadmissible hearsay, meaning an out-of-court statement presented for the purpose of establishing the truth of the content of that statement and that does not fall within an exception to the hearsay rule, may not be considered on a motion for summary judgment. *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) (citation omitted).  The court may consider a hearsay statement if the statement could be "reduced to admissible evidence at trial" or "reduced to admissible form." *Id.* at 1323 (quoting *Wright v. Southland Corp.*, 187 F.3d 1287 (11th Cir. 1999); *Pritchard v. Southern Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996); *McMillian v. Johnson*, 88 F.3d 1573, 1584–85 (11th Cir. 1996)).  Thus,

the out-of-court statement made to the witness (the Rule 56(c)) affiant or the deposition deponent) must be admissible at trial for some purpose.  For example, the statement might be admissible because it falls within an exception to the hearsay rule, or does not constitute hearsay at all (because it is not offered to prove the truth of the matter asserted), or is used solely for impeachment purposes (and not as substantive evidence).

*Id.* at 1323–24 (footnotes omitted).  Here, plaintiff is attempting to use the female Jail officer's statements to prove exactly what is asserted in her statements - that PHS had a custom or policy of inadequately staffing its shifts and of providing cheaper but less efficacious treatment.  As these statements are inadmissible hearsay, the court cannot consider them.

## PROCEDURAL HISTORY

On August 7, 2006 plaintiff filed this lawsuit under 42 U.S.C. § 1983.  On November 6, 2006 he filed an amended complaint seeking damages from Sullivan, Dix, Prison Health Services, Clark, Adams and White, and also seeking injunctive relief against Prison Health Services ("PHS").  Plaintiff claims defendant Sullivan through his use of excessive force during plaintiff's arrest, deprived plaintiff of his rights under the Fourth and Fourteenth Amendments of the United States Constitution.  Plaintiff claims that defendant Dix participated, or at least failed to intervene in Sullivan's use of excessive force.  (Doc. 9, Statement of Claims, p. 8 ¶¶ 1, 2).  Plaintiff asserts that defendants Clark, Adams and White responded unreasonably to his serious medical needs, depriving him of his Fourteenth Amendment rights.  (*Id.*, p. 8 ¶¶ 3, 4).  He seeks to impose liability against PHS on the grounds that they had a custom of "lean staffing" and of improperly training and supervising medical staff which resulted in him suffering grossly inadequate medical care for his serious medical needs.  (*Id.*, p. 8 ¶ 5).  He further contends that medical staff's decisions "were based on funding or lack thereof or fear of reprimand for awakening a doctor or for spending money,"  (*id.*), and that PHS authorized this custom.

On June 27, 2007 defendant PHS filed a special report and accompanying statement of facts.  (Docs. 51, 52).  On July 13, 2007 defendants Sullivan and Dix filed special reports and accompanying statements of facts.  (Docs. 55-58).  Plaintiff responded to the special reports.  (Doc. 69).  On August 22, 2007 the court entered an order construing the special reports as motions for summary judgment, and plaintiff's response as a response to the motions for summary judgment.  The court advised the parties of the importance and ramifications of Rule 56 summary judgment consideration, and informed them that the motions would be taken under advisement on September 21, 2007.  The parties were given thirty days in which to submit any additional Rule 56 materials.  (Doc. 70).  In response, PHS filed a supplemental statement of facts and additional argument.  (Docs. 97, 99).

On August 28, 2007 defendants Stephanie Clark and Annie Adams filed their special reports and accompanying statements of facts. (Docs. 78, 80, 81). Plaintiff responded to the special reports. (Doc. 101). On October 16, 2007 the court entered an order construing the special reports and response as motions for summary judgment and response. The parties were notified that the motions would be taken under advisement on November 16, 2007. (Doc. 108).

On December 7, 2007 defendant Robert White filed a special report. (Doc. 113). Plaintiff responded to the special report on December 29, 2007. (Doc. 115). On January 7, 2008 the court entered an order construing the special report and response as a motion for summary judgment and response. The parties were notified that the motion would be taken under advisement on January 18, 2008. (Doc. 116).

## DISCUSSION

### Defendants Sullivan's and Dix's Motions for Summary Judgment

As a preliminary matter, defendants Sullivan and Dix construe plaintiff's amended complaint as claiming violations of plaintiff's Fourth and Fourteenth Amendment rights based on both excessive force during his arrest <u>and</u> lack of probable cause for his arrest. (Doc. 55, pp. 1-5; doc. 57, pp. 5-7). However, even liberally construing the amended complaint, plaintiff's claims against Sullivan and Dix arise <u>solely</u> from the alleged use of excessive force and failure to intervene. (Doc. 9, p. 8, Statement of Claims ¶¶ 1 and 2). Therefore, the arguments concerning a perceived false arrest or lack of probable cause are not discussed.

As to the excessive force and failure to intervene claims, defendants Sullivan and Dix, in their motions for summary judgment, argue that these claims are barred by *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). (Doc. 55, pp. 6-10; doc. 57, pp. 9-16). They further argue that because plaintiff's claims are barred by *Heck*, they are immune from individual liability based on the doctrine of qualified immunity. (Doc. 55, pp. 11-12; doc. 57, pp. 16-19). Finally, they argue that

they are entitled to summary judgment on plaintiff's claims, because "[o]nly the plaintiff's baseless statements and nothing else support his allegation[s]," and the evidence they have submitted fails to establish that they violated plaintiff's Fourth Amendment rights.  (Doc. 55, pp. 9-10; doc. 57, p. 15).

_____A.    Applicability of *Heck v. Humphrey*

_____The court first must consider whether plaintiff's excessive force and failure to intervene claims are barred by *Heck v. Humphrey*, *supra*.  In *Heck*, the United States Supreme Court held:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus. . . . A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.  Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed. . . .

*Id.*, 512 U.S. at 486-87, 114 S.Ct. 2364 (internal citation and footnote omitted).  The Court then provided an example of "other harm caused by actions whose unlawfulness would render a conviction or sentence invalid:"

> A state defendant is convicted of and sentenced for the crime of resisting arrest, defined as intentionally preventing a peace officer from effecting a *lawful* arrest. . . . He then brings a § 1983 action against the arresting officer, seeking damages for violation of his Fourth Amendment right to be free from unreasonable seizures.  In order to prevail in this § 1983 action, he would have to negate an element of the offense of which he had been convicted. . . . [Therefore], the § 1983 action will not lie.

*Heck*, 512 U.S. at 486-87 n. 6, 114 S.Ct. 2364 (emphasis in original).

Defendants Sullivan and Dix contend that because the alleged excessive force was used prior to plaintiff's arrest and confession, and was the cause of the arrest and confession, his success in this action will necessarily imply the invalidity of his

arrest, confession, and conviction for Grand Theft Auto.  (Doc. 55, p. 7; doc. 57, pp. 8, 12).  Thus, under *Heck* the claims should be dismissed as unripe.  For the reasons that follow the undersigned concludes that a finding in favor of plaintiff's excessive force and failure to intervene claims would not undermine his conviction or sentence.

First, the lawfulness of plaintiff's arrest is not an element of the offense of Grand Theft Auto.[9]  Therefore, a successful § 1983 claim against plaintiff's arresting officers Sullivan and Dix for using excessive force does not necessarily negate an element of the underlying charge of Grand Theft Auto, in contrast to the example in *Heck* cited above.

Second, the logical necessity that is at the heart of the *Heck* opinion is not present here.  A successful § 1983 suit by plaintiff would not "underscore{necessarily} imply the invalidity of his conviction" for Grand Theft Auto.  *Heck*, 512 U.S. at 487 (emphasis added).  The Court in *Heck* emphasized the importance of logical necessity with another example:

> [A] suit for damages attributable to an allegedly unreasonable search may lie even if the challenged search produced evidence that was introduced in a state criminal trial resulting in the § 1983 plaintiff's still-outstanding conviction.  Because of doctrines like independent source and inevitable discovery and especially harmless error, such a § 1983 action, even if successful, would not underscore{necessarily} imply that the plaintiff's conviction was unlawful.

*Heck*, 512 U.S. at 487 n. 1 (citations omitted) (emphasis in original).  Here, plaintiff's conviction for Grand Theft Auto was based on his plea of guilty, not the use of his confession at trial.  Because plaintiff pleaded guilty, the only official record of the facts underlying his conviction and sentence would be the charging information.

---

[9]Plaintiff pleaded guilty to, and was convicted of Grand Theft Auto in violation of Florida Statute 812.014(1)(b) and 812.014(2)(c)6.  (Doc. 58, ex. D).  Section 812.014(1)(b) provides that: "A person commits theft if he or she knowingly obtains or uses, or endeavors to obtain or to use, the property of another with intent to, either temporarily or permanently . . . appropriate the property to his or her own use or to the use of any person not entitled to the use of the property."  Section 812.014(2)(c)6 provides that:  "It is grand theft of the third degree and a felony of the third degree . . . if the property stolen is . . . a motor vehicle. . . ."

Defendants do not argue or provide evidence showing that plaintiff's confession was a fact contained in the information and, therefore, part of the factual basis of his conviction.   Furthermore, even assuming that plaintiff's confession <u>was</u> part of the factual basis of his plea, he concedes that his confession was <u>not</u> the product of the alleged beating, but of his own desire to prevent two innocent young men from going to jail. (Doc. 69, p. 27).  Even if a jury in this civil action found that plaintiff was beaten in the manner and at the time described, this court cannot say that such a finding necessarily implies the invalidity of plaintiff's conviction.  This conclusion is entirely consistent with the Eleventh Circuit's interpretation of *Heck* in *Dyer v. Lee*, 488 F.3d 876 (11th Cir. 2007), where it said:

> [A]s long as it is possible that a § 1983 suit would not negate the underlying conviction, then the suit is not *Heck*-barred.  In the first example in *Heck*, a successful § 1983 suit would necessarily negate one of the elements of the underlying offense; under those circumstances a conviction could not stand, as a matter of law.  This is in contrast to the second example where, even following a successful § 1983 suit, there would still exist a construction of the facts that would allow the underlying conviction to stand.

*Id.,* at 879-80.  Based on the foregoing, the undersigned concludes that the claims raised in this lawsuit -- excessive force and failure to intervene -- are not barred by *Heck*.[10]

Defendant Sullivan further argues that he is entitled to summary judgment because "[o]nly Plaintiff's baseless statements and nothing else support his allegation[s]," and defendant Sullivan "has presented evidence from documented radio transmissions, the time documentation from the Sheriff's Office dispatching system, the testimony of an independent non-party deputy on scene, an EMT's

---

[10]Finally, to address defendants' concern that without the alleged excessive force there would have been no confession and therefore no probable cause for plaintiff's arrest, rendering plaintiff's conviction invalid, this concern is misplaced.  Again, a lawful arrest is not an element of Grand Theft Auto.  Further, even assuming (without deciding) that the lawfulness of plaintiff's arrest mattered, and that the alleged excessive force produced probable cause for plaintiff's arrest, defendants' evidence demonstrates that there were other circumstances such as Harris' and Hestle's descriptions of plaintiff which tied plaintiff to the stolen truck.  (*See* doc. 55, p. 5; doc. 57, pp. 6-7; doc. 58, ex. A, part 1a, p. 25).  Thus, plaintiff's excessive force claim would not <u>necessarily</u> negate the existence of probable cause for his arrest.

medical screening at the jail, a nurse's health evaluation at the jail, a Medical Doctor's evaluation at the jail, and testimony from the Medical Doctor who treated the Plaintiff's spontaneous pneumothorax." (Doc. 55, p. 10). According to Sullivan, based on his evidence a reasonable jury could not find in favor of plaintiff; therefore, no genuine issue of material fact exists. (*Id.*, p. 11). Defendant Dix makes essentially the same argument. (Doc. 57, pp. 8, 15-16, 19).[11] These arguments should be rejected, as the summary judgment record shows that there are genuine issues of material fact for trial.

B.     Summary Judgment Standard

In order to prevail on his motion for summary judgment, the defendant must show that plaintiff has no evidence to support his case or present affirmative evidence that plaintiff will be unable to prove his case at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986). If the defendant successfully negates an essential element of plaintiff's case, the burden shifts to plaintiff to come forward with evidentiary material demonstrating a genuine issue of fact for trial. *Id.* The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing [substantive] law." *Id. Accord Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992). Further, plaintiff must show more than the existence

---

[11]Dix argues that he is entitled to summary judgment because: (1) he "denies any and all allegations contained in the Plaintiff's Amended Complaint as it relates to him," (doc. 57, p. 8); (2) "[o]ther than Jeffries['] lone assertions that he was beaten in the chest by Deputy Sullivan . . . there is nothing in the record which supports such an assertion," (*id.*, p. 15); and (3) the evidence he has submitted shows that other deputies on the scene did not witness any beating of Jeffries, that Jail records do not indicate any marks or bruises on Jeffries, that Jeffries did not begin to complain of any pain or discomfort until January 18, 2004, and that the treating physician stated that Jeffries' physical problems were spontaneous and not the result of trauma, (*id.*, pp. 15-16); and (4) Jeffries admits that he did not make any sounds or cry out for help while he was beaten, that he did not report the beating upon his admission to the Jail, and that he did not tell his public defender about the alleged beating (*id.*).

of a "metaphysical doubt" regarding the material facts, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), and a "scintilla" of evidence or conclusory allegations is insufficient. *Celotex Corp.*, 477 U.S. at 324 (quoting FED.R.CIV.P. 56(e)).  Plaintiff must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  *Celotex Corp., supra*; *Owen v. Wille*, 117 F.3d 1235, 1236 (11th Cir. 1997) ("Rule 56(e) . . . requires the nonmoving party to go beyond the pleading and by h[is] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"), *cert. denied*, 522 U.S. 1126 (1998) (quoting *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(c), (e))); *Hammer v. Slater*, 20 F.3d 1137 (11th Cir. 1994).

Evidence presented by plaintiff in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to the plaintiff.  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970); *Jones v. Cannon*, 174 F.3d 1271, 1282 (11th Cir. 1999).  A motion for summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56; *Celotex Corp.*, 477 U.S. at 322, 106 S. Ct. at 2552.

Here, Sullivan and Dix do not contend that accepting plaintiff's factual allegations as true, the complaint fails to state a constitutional claim as a matter of law.[12]  Rather, they contend that plaintiff's factual allegations are false, and that the

---

[12]Indeed, taking plaintiff's allegations as true and construing them in a light most favorable to him, plaintiff has stated a Fourth Amendment violation. Claims of unreasonable search and seizure implicate the protections of the Fourth Amendment of the United States Constitution, U.S. Const. amend. IV, which applies to the states via the Fourteenth Amendment. *United States v. Davis*, 313 F.3d 1300, 1302 (11th Cir. 2002).  When a plaintiff alleges excessive force by a law enforcement officer, he must show that the officer's conduct was objectively "unreasonable." *Graham v. Connor*, 490 U.S. 386, 395-97, 109 S.Ct. 1865,104 L.Ed.2d 443 (1989).  Such a test looks not to the motivation of the particular officer, but instead examines whether a reasonable officer would have taken the same

evidence they have submitted renders plaintiff's version of events implausible and proves the absence of evidence which would support his claims.  After careful review of the summary judgment record, including plaintiff's response to the motions for summary judgment, the undersigned disagrees.

Defendants' denials do not render implausible plaintiff's sworn statements that at the time of his encounter with Sullivan and Dix he was suspected of stealing a motor vehicle; that he was unarmed, compliant, and never offered resistance or threat of flight to the officers or anyone else at the scene; that Sullivan and Dix escorted him handcuffed to an area not visible to others; that when plaintiff failed to provide information about the stolen vehicle, Sullivan repeatedly thrust the end of a Brinkman flashlight into plaintiff's stomach 25-30 times while laughing and stating "Your [sic] a dumb M ___ F___er aren't you," asking about the stolen vehicle, and also stating, "You don't know who we are do ya' boy?  We run this part of town and your [sic] going to tell us about that truck or we're going to beat you until you do;" and that Dix either participated or failed to intervene in the application of force.

_____

action given the facts and circumstances confronting him.  *Id.*, at 397, 109 S.Ct. 1865;  *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002) ("The question is whether the officer's conduct is objectively reasonable in light of the facts confronting the officer.").

The Supreme Court has recognized that the "right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Graham*, 490 U.S. at 396, 109 S.Ct. 1865.  Consequently, in applying the "objective reasonableness" standard, the court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.*  Moreover, "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make spit-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation."  *Id.*, at 396-97.

In light of all of these considerations, the assessment of a police officer's use of force is a highly factual inquiry. When determining whether an officer's use of force was objectively reasonable, a court should consider "'(1) the need for the application of force, (2) the relationship between the need and the amount of force used, (3) the extent of the injury inflicted and, (4) whether the force was applied in good faith or maliciously and sadistically.'"  *Moore v. Gwinnett County*, 967 F.2d 1495, 1498 (11th Cir. 1991) (quoting *Leslie v. Ingram*, 786 F.2d 1533, 1536 (11th Cir. 1986)).  In short, the Fourth Amendment prohibits force that is objectively unreasonable, both in the decision to implement the force and in the degree of force.  *Graham v. Connor*, 490 U.S. at 394; *Cottrell v. Caldwell*, 85 F.3d 1480, 1492 (11th Cir. 1996).

Furthermore, the affidavits of other sheriff's deputies that they did not witness a beating does not render plaintiff's version of events implausible,[13] nor do the sheriff's office call records[14] or the Jail's admission and medical records.[15] Finally, contrary to defendants' argument, a reasonable jury could find that the alleged beating occurred regardless of whether it found that the beating caused or contributed to plaintiff's lung collapsing.

Thus, this court cannot say that based on the summary judgment record, there are <u>no</u> genuine issues of fact for trial and that a reasonable jury could <u>not</u> find in favor of plaintiff.  Therefore, defendants Sullivan's and Dix's motions for summary judgment should be denied.

<u>Defendants Clark's and Adams' Motions for Summary Judgment</u>

Plaintiff seeks to hold defendants Clark and Adams liable on the grounds that they were deliberately indifferent to his serious medical need.  Specifically, these defendants recognized that plaintiff's respiratory problems posed a substantial risk of serious harm, and they were deliberately indifferent to this serious medical need when they performed a grossly inadequate medical evaluation of his condition, refused him further diagnosis or treatment out of fear of reprimand for waking the on-call physician or incurring the cost of emergency care, and delayed further evaluation or treatment for several hours until the day shift came on duty.

Defendant Clark, in her motion for summary judgment, argues that the evidence she has submitted shows that plaintiff cannot demonstrate she was deliberately indifferent to his serious medical need because neither the affidavits nor

---

[13]Rather, these affidavits and plaintiff's response thereto demonstrate that a genuine dispute of material fact exists for trial concerning whether plaintiff, Sullivan and Dix were within view of other deputies when the alleged beating occurred.

[14]A reasonable jury could find that the Escambia County Sheriff's Office call history record reflects that sheriff's deputies were on the scene at Blount Street from 11:52 p.m. (January 1, 2004) until 12:39 a.m. (January 2, 2004).  (Doc. 58, ex. A, part 1A, pp. 19-22).

[15]Plaintiff's booking photograph shows only his head.  (Doc. 52, ex. C, p. 11).  The medical "Receiving Screening" involved only a "visual observation," not a physical examination.  (*Id.*, ex. B, p. 11; doc. 52, ex. C, p. 15).

the documentary evidence "affirm[s] the notion that Stephanie Clark ever assessed Plaintiff with an emergency or life threatening condition," (doc. 80, p. 5), and her actions were "inconsistent with any subjective intent to inflict unnecessary pain and suffering upon plaintiff." (*Id.*, p. 6).  Defendant Adams presents essentially the same argument.  (Doc. 81, pp. 4-5).

A.    Summary Judgment Standard

The summary judgment standard is set forth on pages 16-17, *supra*.

B.    Fourteenth Amendment Standard

Claims of deliberate indifference to the serious medical needs of pre-trial detainees are governed by the Fourteenth Amendment's Due Process Clause. *Ingraham v. Wright*, 430 U.S. 651, 671 n. 40, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977); *Goebert v. Lee Count*y, — F.3d —, 2007 WL 4458122, at * 11 (11th Cir. Dec. 21, 2007); *Andujar v. Rodriguez*, 486 F.3d 1199, 1203 n. 3 (11th Cir. 2007); *Snow ex rel. Snow v. City of Citronelle, Alabama*, 420 F.3d 1262, 1268 (11th Cir. 2005).  Because the Eleventh Circuit has held that "the minimum standard for providing medical care to a pre-trial detainee under the Fourteenth Amendment is the same as the minimum standard required by the Eighth Amendment for a convicted prisoner," *Lancaster v. Monroe County, Alabama*, 116 F.3d 1419, 1425 n. 6 (11th Cir. 1997), the undersigned analyzes plaintiff's claim under the decisional law of both amendments.  *See Goebert v. Lee County*, at * 11 (holding that the standards under the Fourteenth Amendment are identical to those under the Eighth).

To prevail on his Fourteenth Amendment claim, plaintiff must satisfy both an objective and a subjective inquiry.  The first requirement, the objective component, requires:

> conduct by public officials "sufficiently serious" to constitute a cruel or unusual deprivation – one "denying 'the minimal civilized measure of life's necessities.'"

*Taylor v. v. Adams*, 221 F.3d 1254, 1257-58 (11th Cir. 2000) (citing *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981))), *cert.*

*denied*, 121 S.Ct. 774, 148 L.Ed.2d 673 (2001).  In the context of denial of medical care, this first requirement has been more specifically described as encompassing two subsidiary requirements: an objectively serious need, and an objectively insufficient response to that need.  *Taylor*, 221 F.3d at 1258 (quoting *Estelle v. Gamble*, 429 U.S. 97, 104-06, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976)).

A serious medical need is one that, if left unattended, "pos[es] a substantial risk of serious harm," *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 56 (1994), "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention," *Hill v. DeKalb Reg'l Youth Detention Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994) (quotation omitted).  The seriousness of the deprivation of that need is measured by the detrimental effect that the deprivation brought upon the person.  *Id.* at 1188-89.  "An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Id.* at 1188.

The second requirement, the subjective component of Eighth Amendment analysis, requires "a subjective intent by the public officials involved to use the sufficiently serious deprivation in order to punish." *Taylor* at 1258 (citing *Wilson v. Seiter*, 501 U.S. at 300, 111 S.Ct. at 2325)("The source of the intent requirement is not the predilections of this Court, but in the Eighth Amendment itself, which bans only cruel and unusual *punishment*.  If the pain inflicted is not formally meted out *as punishment* by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify." (emphasis in original)).  "To show the required subjective intent to punish, a plaintiff must demonstrate that the public official acted with an attitude of 'deliberate indifference.'" *Taylor* at 1258 (quoting *Estelle*, 429 U.S. at 105, 97 S.Ct. at 291).

Deliberate indifference is not established "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be

aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 114 S.Ct. at 1979. To sustain a claim, plaintiff must show that the challenged conduct was "very unreasonable in light of a known risk" of harm or suffering. *Hardin v. Hayes*, 52 F.3d 934, 939 (11th Cir. 1995)(citing *Farmer*, 114 S.Ct. at 1978-79). Deliberate indifference must be more than a medical judgment call or an accidental or inadvertent failure to provide adequate medical care. *Murrell v. Bennett*, 615 F.2d 306, 310, n. 4 (5th Cir. 1980). An inadvertent or negligent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be "repugnant to the conscience of mankind." *Id.* at 105-06, 97 S.Ct. at 292; *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L. Ed.2d 662 (1986). Negligence alone is not enough to violate the constitution. *Id.*

Obviously, a complete denial of readily available treatment for a serious medical condition constitutes deliberate indifference. *Harris v. Coweta County*, 21 F.3d 388, 393 (11th Cir. 1994). And medical treatment can be so slight as to amount to no treatment at all, and so the mere fact that treatment was provided does not end the inquiry. *Waldrop*, 871 F.2d at 1035. Similarly, "grossly incompetent medical care or choice of an easier but less efficacious course of treatment can constitute deliberate indifference." *Id.*; *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986) (stating that medical treatment that is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness" constitutes deliberate indifference.). However, disputes regarding the level of treatment or the existence of other treatment options do not alone evidence cruel and unusual punishment. *Estelle*, 429 U.S. at 107, 97 S.Ct. at 292; *Hamm*, 774 F.2d at 1575. Where the inmate has received medical attention, and the dispute is over the adequacy of that attention, courts should be reluctant to question the accuracy or appropriateness of the medical judgments that were made. *Harris v. Thigpen*, 941 F.2d 1495, 1507 (11th Cir. 1991) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989)). To do otherwise would be "to constitutionalize claims that sound in tort law." *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985). In other words,

a difference of opinion over matters of medical judgment does not give rise to a constitutional claim. *Harris*, 941 F.2d at 1505; *Waldrop* at 1033.

    C.    **Conclusions of Law Regarding Material Facts**

    The following facts are without substantial controversy.  Defendant Clark is licensed by the State of Florida as an Emergency Medical Technician (EMT).  (Doc. 52, ex. D ¶ 3).  Her scope of practice is defined in Florida Statutes § 401.23(7) and includes:

> the use of techniques such as patient assessment, cardiopulmonary resuscitation (CPR), splinting, obstetrical assistance, bandaging, administration of oxygen, application of medical antishock trousers, administration of a subcutaneous injection using a premeasured autoinjector of epinephrine to a person suffering an anaphylctic reaction, and other techniques described in the Emergency Medical Technician Basic Training Course Curriculum of the United States Department of Transportation.

Defendant Adams is a Registered Medical Assistant (RMA).  She graduated from a medical assistants program at Capps Medical Institute in Pensacola, Florida in 2001. (Doc. 52, ex. E ¶ 3).  Defendant Adams' job duties with PHS consist of drawing blood, administering medications, and noting orders.  (*Id.*, ¶ 4).

    There further appears to be little dispute concerning: (1) the nature of plaintiff's symptoms upon Clark and Adams arriving at his cell, (2) the treatment they provided, or (3) that approximately 8 hours after plaintiff initially declared a medical emergency he was seen by the physician's assistant, diagnosed with a "probable pneumothorax," and transported to Sacred Heart Hospital's Emergency Room where plaintiff was diagnosed with a spontaneous tension right pneumothorax.  (Doc. 52, ex. C, p. 9).  Defendants do not dispute that a tension pneumothorax is a life-threatening condition.  *See also* http://www.nlm.nih.gov/medlineplus/ency/article/000090.htm.

    There are, however, several genuine issues of material fact regarding: whether plaintiff had a serious medical need at the time Clark and Adams provided care, (2) whether they were subjectively aware that plaintiff faced a substantial risk of serious harm, and (3) whether their response to that risk was objectively

unreasonable.[16]  With regard to the first inquiry, although it seems beyond dispute that plaintiff's medical need was serious, defendants Clark and Adams seem to imply that plaintiff did not have an objectively serious medical need at the time they treated him, and that a serious medical need did not arise until later that morning near the time plaintiff was seen by the physician's assistant.  In apparent support of this position defendants have submitted an affidavit of Dr. Monastero in which Dr. Monastero opines:

> From my review of the records, Mr. Jeffries was transferred to the hospital approximately eleven hours after being seen and evaluated by the medical staff when he initially complained on January 19, 2004, and was later diagnosed of having a pneumothorax.  Not all pneumothorax's [sic] are emergency conditions.  Quite commonly, a pneumothorax may start out small and can frequently resolve on their own.  There are however times when a small pneumothorax will progress.  It is my opinion that this is what most likely [sic] occurred with Mr. Jeffries following his evaluation and that progression most probably developed close to the time of the evaluation by the P.A. on January 19, 2004, for which he was appropriately and timely transferred to the hospital.

(Doc. 97, Monastero Aff. ¶ 9).  To the extent this is, in fact, defendants' position, it does not provide a basis for summary judgment.  Dr. Monastero's opinion is based in large part on the fact that plaintiff's vital signs were "stable," and that his condition improved following administration of Mylanta. (*Id.*, ¶¶ 6-7).  This evidence, however, does not render implausible plaintiff's assertion that he had a serious medical need at the time he was seen by Clark and Adams.  The evidence in the summary judgment record reveals that plaintiff presented essentially the same symptoms to Clark and Adams as he did to the physician's assistant and to medical

---

[16]For example, the parties dispute the degree of distress plaintiff was in at the time Clark and Adams responded to his cell; whether Clark and Adams directed plaintiff to breathe into a paper bag; whether plaintiff lost consciousness in their presence; whether plaintiff asked to see a doctor and whether defendants' stated bases for denying the request were cost and concern for waking the on-call physician.  In addition, Clark and Adams deny indicating that plaintiff should probably go to the hospital.  They deny making any statements indicating the belief that plaintiff was ever experiencing a life-threatening emergency.  They also deny making any comments to plaintiff regarding the cost of emergency transport to a hospital or the cost of having a physician present at the facility (although they do not specifically deny plaintiff's allegation that he heard one of them make such statements to a female Jail officer).  Clark and Adams deny escorting plaintiff back to his cell.

staff at Sacred Heart Hospital.  He complained of sharp pain in his chest, shortness of breath and severe difficulty breathing.  His condition was exacerbated when he attempted to lie down.  His vital signs were relatively normal.[17]  (Doc. 52, ex. C, p. 25; doc. 58, ex. A, part 1b, p. 25).  The only noted difference in plaintiff's symptoms was that the Jail's physician's assistant and Sacred Heart's medical staff noted plaintiff had no breath sounds on the right side of his chest.  No such notation was made by Clark.  However, a reasonable juror could conclude from the summary judgment evidence that neither Clark, Adams, nor Gregory ever listened to plaintiff's lungs or breath sounds, and that this does not negate plaintiff's contention that his respiratory issues were a serious medical need at the time Clark and Adams evaluated and treated him.

Indeed, taking the facts in the light most favorable to plaintiff and construing all reasonable inferences in his favor, his medical condition at the time he was assessed and treated by Clark and Adams could be deemed objectively serious.  *See Donnell v. Maples*, 2005 WL 1684166 (N.D. Fla. July 18, 2005), *adopted by* 2005 WL 2007058 (N.D. Fla. Aug. 16, 2005).[18]  Defendants cannot genuinely deny that at the

---

[17]Plaintiff's vital signs at the relevant times were as follows:

At the time Clark first assessed plaintiff in his cell at 2:15 a.m., his temperature was 97.5°.  His respiration rate was 24, his pulse 110, and his blood pressure 120/70.  (Doc. 52, ex. C, p. 25).

At the time Clark re-assessed plaintiff at the nurse's station at 2:40 a.m., his pulse was 88 and his blood pressure 120/80.  (Doc. 52, ex. C, p. 25; doc. 52, ex. D ).

At the time Clark re-assessed plaintiff's vital signs at 3:20 a.m., his respiration rate was 18, his pulse 74, his blood pressure 111/67, and his oxygen saturation level 91% to 96%.  (Doc. 52, ex. C, p. 24; doc. 52, ex. D ¶ 15).  His pain level was 10, using numeric pain scoring.  (Doc. 9, p. 7C).

At the time Clark was seen by the physician's assistant at 11:00 a.m., his oxygen saturation rate was ninety-something percent.  (Doc. 52, ex. C, p. 31).

At the time Clark was assessed in triage at Sacred Heart Hospital, his temperature was 98°.  His respiration rate was 20, his pulse 72, his blood pressure 117/77, and his oxygen saturation level 95%.  (Doc. 58, ex. A, part 1b, p. 25).  His pain level was 10, using numeric pain scoring.  (*Id.*).

[18]In *Donnell,* the defendants moved for summary judgment, contending that although the prisoner had been immediately diagnosed with a large pneumothorax in his right lung upon arrival at the hospital, he did not have a serious medical need four days earlier when he complained to medical staff of severe chest pain, shortness of breath and a history of pneumothorax.  The court held that taking the plaintiff/prisoner's version of the facts as true and construing them in the light most favorable to him, a reasonable jury could find that his needs obviously warranted medical attention.

time they provided care plaintiff's medical need was one that, if left unattended, posed a substantial risk of serious harm.[19]   Plaintiff has presented evidence that he had sharp "crushing" pain and cramping in his chest; that he was experiencing severe shortness of breath similar to that of a panting dog - very shallow, rapid, short breaths; that he was unable to breathe unless he assumed the unusual posture of standing with both arms raised over his head; and that he lost consciousness when he attempted to follow Clark's instruction to breathe slowly into a paper bag. Clark assessed plaintiff's condition as "poor," administered oxygen though a mask, and took him to the nurse's station for evaluation for a cardiac problem.  Clark was unable to obtain an EKG reading because plaintiff was unable to lie down or sit still long enough.  Although plaintiff experienced some relief from his symptoms after receiving a dose of Mylanta, he  continued to have shortness of breath to the point that he was unable to complete whole sentences without gasping for air.  He also continued to have pain and cramping in his chest, and he continued to require the unusual posture of standing with his arms raised over his head in order to maintain his breathing.  The medical evidence plaintiff has submitted indicates that in minor cases of pneumothorax, one may not realize he has a pneumothorax, but that symptoms of a severe case are severe shortness of breath and sudden, severe and sharp chest pain.  *See WebMD*, http://www.webmd.com/a-to-z-guides/Collapsed-Lung-Pneumothorax-Topic-Overview.[20]   Further, according to plaintiff's version of events, at the time Clark decided to return him to his cell, she and Adams acknowledged that he should probably go to the hospital.  Laymen commented that plaintiff appeared ready to "drop dead."   Plaintiff's medical need was "left

---

[19]Indeed, neither Clark nor Adams explicitly denies that plaintiff's condition was serious. Instead, they argue that his condition was not a life-threatening emergency. (Doc. 52, ex. D ¶18; doc. 52, ex. E ¶ 16; doc. 97, Monastero Aff. ¶ 7).  As the Eleventh Circuit has held, however, the medical needs of inmates need not be considered "life threatening" to be considered serious under *Estelle*. *See Washington v. Dugger*, 860 F.2d 1018, 1021 (11th Cir. 1988).

[20]*See Fagocki v. Algonquin/Lake-In-The-Hills Fire Protection Dist.*, 496 F.3d 623, 624 (7th Cir. 2007) (considering evidence from *WebMD* on motion for summary judgment); *Harrison v. Moketa/Motycka*, 485 F.Supp.2d 652, 660 n.4 (D. S.C. 2007) (same); *Bacon v. Hennepin County Med. Ctr.*, 2007 WL 4373104, at *1 (D. Minn. Dec. 11, 2007) (same); *Gibsom v. Hartford Life and Accident Ins. Co.*, 2007 WL 1892486 (E.D. Pa. June 29, 2007) (same); *Menard v. Hartford Life and Accident Ins. Co.*, 2006 WL 3091527, at *1 n.2 (M.D. Fla. Oct. 30, 2006) (same).

unattended" for 7-8 hours until he was eventually seen by a physician's assistant and immediately diagnosed with a "probable" pneumothorax.  He was transported to the emergency room at Sacred Heart Hospital and diagnosed with a complete right pneumothorax.  A reasonable factfinder could conclude that plaintiff had a serious medical need at the time Clark provided care.

Furthermore, taking the facts in the light most favorable to plaintiff, plaintiff could be deemed to have shown that Clark acted with deliberate indifference to his serious medical need.  In order to satisfy this component, the "[p]laintiff must prove three things: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005) (per curium) (second alteration in original) (internal quotation marks omitted).  With regard to the subjective knowledge component, the United States Supreme Court held in *Farmer* that: "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842, 114 S.Ct. at 1983.  Disregard of the risk is also a question of fact that can be shown by standard methods.  *Id.* at 846, 114 S.Ct. at 1983.  The meaning of the third element, was recently discussed by the Eleventh Circuit in *Goebert v. Lee County*, 2007 WL 4458122, at *12:

> The meaning of "more than gross negligence" is not self-evident but past decisions have developed the concept.  In cases that turn on the delay in providing medical care, rather than the type of medical care provided, we have set out some factors to guide our analysis.  Where the prisoner has suffered increased physical injury due to the delay, we have consistently considered: (1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay.

*Id.* (citing *Hill v. Dekalb Reg'l Youth Detention Ctr.*, 40 F.3d at 1189).

The *Farmer* Court identified three ways in which prison officials might avoid liability.  Officials might show: (1) "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger;" (2) that "they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent;" or (3)

that "they responded reasonably to the risk, even if the harm ultimately was not averted." 511 U.S. at 844, 114 S.Ct. at 1982-83.

Here, despite Clark's denials that she ever believed plaintiff to be experiencing a life-threatening emergency, a reasonable jury could infer from the obviousness of the situation confronting her that she was aware plaintiff's condition posed a substantial risk of serious harm. *See Farmer*, 511 U.S. at 842-43, 114 S.Ct. at 1981. According to plaintiff and Clark's own notations in his medical records, when Clark arrived at plaintiff's cell he informed her that he was awakened by crushing pain in his chest and was experiencing extreme shortness of breath. He stated, "I can't breathe," and was maintaining a highly unusual posture of standing with his arms raised over his head. Even then, he gasped for air and panted like a dog. When Clark attempted to treat plaintiff for hyperventilation, he lost consciousness. Clark deemed plaintiff's condition "poor," and his symptoms serious enough to warrant evaluation for a cardiac problem. In fact, his respiratory issues were so severe that she was unable to obtain an EKG reading. Even after administration of Mylanta and plaintiff reporting some relief from his symptoms and agreeing to return to his cell, Clark was aware that: (1) plaintiff had experienced a similar temporary improvement in his symptoms prior to declaring the medical emergency to which she responded, yet his symptoms had returned with the same if not greater severity, (2) plaintiff was still complaining of pain and cramping in his chest, (3) plaintiff was still short of breath and unable to complete whole sentences without gasping for air, and (4) plaintiff still required special posturing (arms raised overhead) in order to breathe. Additionally, on the way to the elevator Clark witnessed plaintiff having to stop every few feet to catch his breath, and she and Adams acknowledged that plaintiff should probably go to the hospital. Upon arriving at plaintiff's dormitory, defendant White commented to Clark that plaintiff looked as though he were going to "drop dead." From these circumstances a reasonable factfinder could deduce that Clark recognized plaintiff had a serious medical need during the time she provided care.

The next question is whether there is a genuine dispute of material fact with regard to whether Clark failed to respond to that risk in an objectively reasonable manner (i.e., whether her conduct was more than gross negligence). Specifically,

plaintiff maintains that Clark was deliberately indifferent to his serious medical needs when she:

> - ignored PHS policy requiring that the on-call physician be notified of a medical emergency, and refused to notify the on-call physician for fear of reprimand (doc. 9, p. 8 ¶ 4; doc. 69, pp. 9-10);

> - failed to obtain emergent treatment for plaintiff (transport to a hospital) on account of cost even though plaintiff's symptoms fit those requiring emergent treatment under accepted professional judgment, practice and standards (doc. 101, p. 3 and ex. A-1, *WebMD*, http://www.webmd.com/heart-disease/tc/Chest-Pain-Emergencies);

> - engaged in the custom or practice of performing an unsupervised evaluation of plaintiff's emergent medical needs and relaying that information to Registered Nurse Gregory for diagnosis instead of having Gregory or the on-call physician visually or physically examine and evaluate plaintiff (doc. 69, pp. 9, 13-14; doc. 101, p. 7);

> - followed Gregory's instruction to treat plaintiff for gas, even though Clark suspected plaintiff was having a cardiac problem, knew that plaintiff was too unstable to obtain an EKG reading, knew that he was experiencing severe difficulty breathing and crushing chest pain, and knew that Gregory had neither seen nor physically examined plaintiff (doc. 69, p. 13; doc. 101, p. 7); and

> - returned plaintiff to his cell and delayed further evaluation or treatment for several hours due to fear of reprimand and cost of hospital treatment, knowing that the Mylanta had not resolved plaintiff's complaints, and that plaintiff was still complaining of cramping in his chest, experiencing shallow respirations, gasping slightly, and unable to complete whole sentences without gasping for air (doc. 69, p. 15; doc. 101, p. 8).[21]

Clark admits that she had the authority to initiate the process to transport plaintiff to the hospital for emergent care. (Doc. 52, ex. D ¶ 18). She further admits that she had the authority to send plaintiff to the main infirmary for formal evaluation by Nurse Gregory who would have consulted with the on-call physician if necessary. (*Id.*). According to plaintiff's version of the facts, Clark deliberately declined both options, instead choosing to informally consult with Nurse Gregory during the

---

[21]Initially, plaintiff sought to hold Clark liable for misdiagnosing him. (Doc. 9, Statement of Claims ¶ 4). However, plaintiff appears to concede that it was Gregory, not Clark, who misdiagnosed him. (Doc. 69, p. 9).

course of getting a soda, and relating an incomplete if not inaccurate statement of plaintiff's symptoms by: (1) failing to inform Gregory that this was plaintiff's second episode of chest pain and shortness of breath; (2) failing to inform Gregory that plaintiff required an unusual posture in order to maintain his breathing; (3) failing to inform Gregory that plaintiff lost consciousness; and (4) reporting to Gregory that there were no abnormal EKG findings when in fact plaintiff was too unstable to obtain an EKG reading.  (*See* doc. 52, ex. F ¶ 11).[22]  When plaintiff questioned the diagnosis of gas as inconsistent with his chest pain, Clark refused him further evaluation due to fear of reprimand.  After observing plaintiff for approximately 30 minutes following the dose of Mylanta, defendant Clark decided to terminate her observation of plaintiff and delay further evaluation.  Clark states in her affidavit that her decision was based on her belief that plaintiff was stable because he expressed some relief from his symptoms and indicated he could return to his cell.  But according to plaintiff's version of the facts, at that time Clark knew that plaintiff's chest pain and breathing difficulty persisted; she assessed plaintiff's condition as merely "fair;" and she acknowledged that plaintiff should probably go to the hospital but would not send him due to cost and fear of reprimand.  Her decision to delay further evaluation or treatment resulted in plaintiff enduring "grievous suffering" for over seven hours, and almost losing his life. (Doc. 9, p. 8 ¶ 4).  On these facts, a reasonable juror could find that Clark acted with more than gross negligence.

The final requirement is that plaintiff demonstrate a causal connection between Clark's conduct and the constitutional harm.  *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003).  "Causation, of course, can be shown by personal participation in the constitutional violation."  *Goebert*, 2007 WL 4458122, at * 12 (citing *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986) (per curium)).  Taking the summary judgment evidence in the light most favorable to plaintiff, a reasonable jury could conclude that Clark's conduct, including her delay, caused plaintiff to endure hours of pain and suffering and almost lose his life.  For all of the foregoing

---

[22]Nurse Gregory states in her affidavit that, "[a]ccording to the medical records, [Clark] informed me of [plaintiff's] complaints of shortness of breath and chest pain accompanied by normal vital signs.  She informed me that there were no abnormal EKG findings."

reasons, the undersigned concludes that defendant Clark is not entitled to summary judgment.

The court reaches a different conclusion, however, with regard to defendant Adams.  The undisputed summary judgment evidence establishes that Adams' role was that of assisting Clark and administering the Mylanta pursuant to Nurse Gregory's order.  She was not responsible for assessing plaintiff or relating his symptoms to Gregory, had no authority to initiate plaintiff's transport to a hospital, and was not involved in the decision to terminate observation of plaintiff, delay further evaluation or return plaintiff to his cell.  (Doc. 52, ex. E).  In sum, plaintiff has failed to come forward with evidentiary material demonstrating a genuine issue of fact for trial on causation as it relates to defendant Adams.

<u>Defendant Prison Health Services' Motion for Summary Judgment</u>

Plaintiff seeks to hold defendant Prison Health Services ("PHS") liable on the grounds that although it had adequate written policies in place, this entity had unwritten customs (superceding its formal written policies) of: (1) hiring unqualified staff, (2) failing to adequately train staff to assess inmates and recognize symptoms requiring further evaluation or emergency treatment, (3) failing to adequately supervise staff, (4) basing night-shift staffing levels on cost instead of necessity, and (5) basing medical treatment on cost instead of need (i.e., providing cheaper but less efficacious treatment, all of which directly contributed to plaintiff's suffering.  (Doc. 9, Statement of Claims ¶ 5).  He asserts that, "[a]t no time should decisions as to my medical care been based on funding or lack thereof or fear of reprimand for awakening a doctor or for spending money."  (*Id.*).

PHS, in its motion for summary judgment, argues that even assuming plaintiff could ever show that defendant Clark or Adams was deliberately indifferent to his serious medical need, PHS is entitled to summary judgment because based on the evidence it has submitted, plaintiff cannot establish the existence of a policy or custom that was the moving force behind the constitutional violation.  PHS further contends that it is entitled to Eleventh Amendment Immunity to the extent plaintiff seeks recovery for monetary damages in PHS' official capacity.  (Doc. 51).

B.      Summary Judgment Standard

The summary judgment standard in set forth on pages 16-17, *supra*.

C.      Municipal Liability Standard

In a § 1983 action, the corporate medical provider for jail inmates cannot be held liable for the acts of its employees.  *Ort v. Pinchback*, 786 F.2d 1105, 1107 (11th Cir. 1986); *accord Buckner v. Toro*, 116 F.3d 450, 452-53 (11th Cir. 1997) (finding that § 1983's municipality law is to be applied to a corporate medical provider); *see Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036 (1978) (ruling that a municipality cannot be held liable in a § 1983 action under the theory of *respondeat superior* simply because it employs a tortfeasor).  A corporate medical provider can only be held liable if its custom or policy reflects a "deliberate indifference to the rights of persons with whom [its staff] come into contact."  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 418 (1989) (footnote omitted); *see Monell*, 436 U.S. at 694, 98 S.Ct. at 2037-38; *Ort*, 786 F.2d at 1107.  Deliberate indifference may be established by a pattern of constitutional violations, *City of Canton*, 489 U.S. at 397, 109 S.Ct. 1197 (O'Connor, J., concurring in part) or even by a single decision under "appropriate circumstances." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

A policy is a decision that is officially adopted by the municipality, or created by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality.  *See Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1479-80 (11th Cir. 1991).  A custom is a practice that is so settled and permanent that is takes on the force of law.  *Monell* 436 U.S. at 690-91, 98 S.Ct. 2018. Whether a municipality or corporate medical provider had a particular policy or custom is a question of fact.  *City of Canton, Ohio v. Harris*, 489 U.S. at 392, 109 S.Ct. 1197; *Bruce v. Beary*, 498 F.3d 1232, 1249 (11th Cir. 2007).

D.      Conclusions of Law Regarding Material Facts

In the present case, plaintiff has failed to show that there is a genuine issue of material fact for trial concerning PHS' alleged policy of hiring unqualified staff. Plaintiff has submitted no evidence of the existence of such a custom or policy.

Furthermore, no custom or policy of hiring unqualified individuals can be inferred from the alleged actions or inactions of PHS employees.  Indeed, plaintiff does not dispute that defendants Clark and Adams were qualified for the positions of EMT and RMA, respectively, which are the positions they held at PHS.  Moreover, plaintiff's allegations fail to create an issue of fact as to whether a failure to hire qualified staff had the necessary causal connection to his injury.  Thus, PHS is entitled to summary judgment on this theory of liability.

Plaintiff next seeks to hold PHS liable on the grounds that it failed to train and supervise adequately Jail medical staff to assess inmates and recognize life-threatening respiratory situations or symptoms requiring further evaluation or emergency treatment.  PHS has submitted evidence that at the time of hire, medical staff of PHS at the Jail were provided with Orientation Training, which included review and instruction concerning all Policies and Procedures of PHS relating to inmate medical, dental and mental health care, as well as review and instruction on all Protocols in effect in the Infirmary of the Jail.  (Doc. 52, ex. A, Dell Aff. at ¶ 4).  In addition,  medical staff was provided Continuing Educational Courses and Monthly Staff training Sessions in various areas of medical, dental and mental health care. (*Id.*, at ¶ 5).  Thereafter, staff was required to review the Policies and Procedures, as well as all Protocols in the Infirmary on an annual basis.  (*Id.*).  Any time there was a new or updated or changed Policy, Procedure, or Protocol, the staff was notified in the monthly training meetings.  (*Id.*).  PHS asserts that numerous policies and procedures were in place by PHS at the Jail to address medical care.  It has submitted some of the more relevant policies pertaining to Access to Care, Continuing Education for Health Care Providers, Staffing Plan, Orientation for Health Staff and Emergency Services.  (Doc. 52, ex. G).

In response, plaintiff asserts that notwithstanding PHS' formal written policies, it had a superceding unwritten custom of failing to adequately train and supervise its medical staff.  He relies on two sources of evidence to show that there is a genuine issue of fact for trial.  First, he relies on the actions or inactions of Clark as proof that PHS failed to train adequately its staff.  Second, he relies on the "fact" that while he was awaiting transport to the hospital, the PHS physician began to

instruct medical staff on the proper techniques for diagnosing a breathing ailment, using plaintiff as an example.  In plaintiff's opinion, it was "painfully obvious these medical staff . . . had little or no training." (Doc. 9, p. 7F).

As discussed above, PHS' liability may be based on a claim of inadequate training or supervision where its failure to train in a relevant respect evidences a deliberate indifference to the rights of inmates with whom its employees come into contact.  However, deliberate indifference is exhibited only when a "municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action."  *Gold v. City of Miami*, 151 F.3d 1346, 1350-51 (11th Cir. 1998).  In this case plaintiff has failed to submit evidence from which a reasonable factfinder could infer that PHS had notice of the need to train or supervise its employees in the area of assessing inmates and recognizing life-threatening respiratory situations or symptoms requiring further evaluation or emergency treatment, and that PHS made a deliberate choice not to take any action.  Thus, plaintiff has failed to raise a genuine issue of fact for trial on this theory of liability.  The same is true of plaintiff's claim that PHS failed to staff adequately its night shift.

Remaining is plaintiff's claim that PHS had an unwritten custom or policy of basing medical treatment on cost instead of need.  Plaintiff's evidence of this alleged custom or policy are the statements by Clark and/or Adams as they escorted plaintiff out of the infirmary.  Specifically, plaintiff alleges that he overheard the female Jail officer say to Clark and Adams, "He doesn't look so good.  Do you think we should get him to the hospital?"  (Doc. 9, p. 7D).  The response was, "He probably should go, but I'm not signing anything that's going to cost that kind of money."  (*Id.*, p. 7D).  Clark and Adams then voiced joint concern along the lines of "you know how they are about that."  From this evidence a reasonable jury could infer the existence of a custom of deliberate indifference so long-standing and widespread as to be considered authorized by PHS' policymaking officials.[23]

_____

[23]One final note.  Plaintiff asserts n his response to the motion for summary judgment that Nurse Elaine Gregory was deliberately indifferent to his serious medical needs when she: (1) followed her own "custom" of basing her diagnosis on the unsupervised assessment of defendant Clark without Gregory personally examining or even seeing plaintiff; (2) determined that it was not

### E.    Eleventh Amendment Immunity

PHS asserts that it is entitled to Eleventh Amendment immunity to the extent plaintiff seeks recovery for monetary damages in PHS' official capacity.  (Doc. 51, p. 11).  PHS analogizes its contractual agreement to provide medical services to the Escambia County Jail to a health care provider that has contractually agreed to act as an agent of the Department of Corrections to provide health care services to inmates of the State of Florida correctional system.  (*Id.*, p. 12 (citing Fla. Stat. § 768.28(10)(a))).

The law is "well-settled that Eleventh Amendment immunity bars suits brought in federal court when an 'arm of the State' is sued."  *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003) (en banc).  The question of whether the entity sued is an arm of the state "must be assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise."  *Id.* To determine whether the defendant, while engaged in the particular function at issue, acts as an arm of the state, the court must conduct a four-factor inquiry, considering: "(1) how state law defines the entity; (2) what degree of control the state maintains over the entity; (3) the source of the entity's funds; and (4) who bears financial responsibility for judgment entered against the entity."  *Abusaid v. Hillsborough County Bd. Of Comm'rs*, 405 F.3d 1293, 1303 (11th Cir. 2005).  When the defendant entity is a county sheriff, the court's determination is dependent on the law of the state in which the sheriff operates.  *Id.*

Here, PHS contractually agreed to act as an agent of the Sheriff of Escambia County, Florida to provide health care services to inmates of the Escambia County Jail.  *See Mitchell v. Untreiner*, 421 F.Supp. 886, 888 (N.D. Fla. 1976) (referring to Sheriff of Escambia County, Florida as "the Chief Jailer of the Escambia County Jail").   The relevant function in this case is the provision of health care services to

---

necessary to contact the on-call physical or initiate emergency transport without ever seeing or examining plaintiff; and (3) followed a custom of administering Mylanta to all inmates regardless of their symptoms.  (Doc. 69, p. 9).  However, Nurse Gregory is not named as a defendant in this action; therefore this court need not decide whether her actions, taken pursuant to her own "customs" constituted deliberate indifference to plaintiff's serious medical needs.

inmates of the county jail.  Thus, the proper inquiry is whether the sheriff acts as an arm of the state in providing these services.

Because, as the *Hufford* and *Abusaid* Courts concluded, Florida's constitution and case law establish overwhelmingly that Florida law defines sheriffs as county officials, the first factor of the test weighs against arm-of-the-state status to PHS. *See Abusaid*, 405 F.3d at 1305-06.  The second factor – the state control over the sheriff – also weighs against arm-of-the-state status to PHS.  *Id.*, at 1306-09. Plaintiff's claim arises out of the actions taken by PHS (the Sheriff) in providing health care to inmates at the Escambia County Jail.  PHS relies on Section 768.28(10)(a), Florida Statutes, as authority for the proposition that it enjoys state agency status.  (Doc. 51, p. 12).  Section 768.28(10)(a) provides:

> **(10)(a) Health care providers or vendors, or any of their employees or agents, that have contractually agreed to act as agents of the Department of Corrections to provide health care services to inmates of the state correctional system shall be considered agents of the State of Florida, Department of Corrections, for the purposes of this section, while acting within the scope of and pursuant to guidelines established in said contract or by rule. The contracts shall provide for the indemnification of the state by the agent for any liabilities incurred up to the limits set out in this chapter.**

Florida courts have interpreted this section as excluding health care providers to county jails.  *See Mingo v. ARA Health Servs., Inc.*, 638 So.2d 85, 86  (Fla. Dist. Ct. App. 1994) (holding that health care providers to county jails are not agencies of the state as a matter of law); *Bradshaw v. Sandler*, 955 So.2d 1219, 1221 (Fla. Dist. Ct. App. 2007).  Turning to the third factor, sheriffs are funded entirely by county taxes and are required to pay to the county any fees, commissions, or other money earned by the office.  *Abusaid*, 405 F.3d at 1310-11.  Under the fourth factor, the *Abusaid* Court cited *Lucas v. O'Loughlin*, 831 F.2d 232 (11th Cir. 1987) for the proposition that counties may be held liable for a judgment against a sheriff, and as such, the state coffers are not burdened by a judgment against the sheriff.  *Id.*, at 1313.  In summary, all four factors yield the conclusion that neither the Escambia County Sheriff nor PHS acts as an arm of the state in providing health care services to county jail inmates.  Therefore, the undersigned concludes that PHS is not entitled to the benefit of Eleventh Amendment immunity from plaintiff's monetary damages claims.

<u>**Defendant White's Motion for Summary Judgment**</u>

Plaintiff seeks to hold defendant White liable on the grounds that he was deliberately indifferent to plaintiff's serious medical need.  Specifically, plaintiff contends that this defendant was well aware that plaintiff had a serious medical need after plaintiff returned from the medical department, and that he was deliberately indifferent to this need when he refused to contact the medical department after plaintiff reported that he was again unable to breathe, and essentially ignored for hours plaintiff's suffering.  (Doc. 9, p. 8 ¶ 3).

Defendant White, in his motion for summary judgment, argues that the summary judgment evidence (including plaintiff's version of events) demonstrates that he responded reasonably to plaintiff's declaration of a medical emergency.  He further argues that he was not aware plaintiff had a serious medical need after plaintiff returned from the medical department and, in any event, responded reasonably by relying on the medical diagnosis and treatment provided by the medical personnel at the Jail while continuing to monitor plaintiff during the remainder of his shift.  (Doc. 113, pp. 8-9).  Finally, he contends he is entitled to qualified immunity (further arguing that plaintiff cannot meet the burden of demonstrating that he violated clearly established law).  (*Id.*, pp. 9-11).

A.     **Summary Judgment Standard**

The summary judgment standard is set forth on pages 16-17, *supra*.

B.     **Fourteenth Amendment Standard**

The Fourteenth Amendment standard is set forth on pages 19-22, *supra*.

C.     **Qualified Immunity**

The doctrine of qualified immunity is a guarantee of fair warning.  *McElligott v. Foley,* 182 F.3d 1248, 1260 (11th Cir. 1999).  It shields government officials from individual capacity suits against them for acts that do not violate a clearly established statutory or constitutional right of which a reasonable person would have known given the circumstances and information possessed by the official at the time of the conduct.  *Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002); *Conn v. Gabbert,* 526 U.S. 286, 119 S.Ct. 1292, 1295, 143 L.Ed.2d 399 (1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396

(1982)); *Powell v. Georgia Dep't of Human Resources*, 114 F.3d 1074 (11th Cir. 1998). Qualified immunity seeks to ensure that individuals can reasonably anticipate when their conduct may give rise to liability, and hence, liability only attaches if the contours of the right allegedly violated are sufficiently clear that a reasonable person would understand that what he is doing violates that right. *McElligott*, 182 F.3d at 1260 (citing *United States v. Lanier,* 520 U.S. 259, 270, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)).

In order to receive qualified immunity, the public official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d at 1194 (internal quotation marks omitted). "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Id.*, at 1194. The Supreme Court has established a two-part test for evaluating a claim of qualified immunity. First, the trial court must determine whether a constitutional right has been violated on the facts alleged. *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001). The court must assess the facts in a light most favorable to the party asserting the injury. *Id*. Second, if a violation has been established, the court must determine whether the right was "clearly established." *Id*. The very action in question need not have been held unlawful for an official to lose the protection of qualified immunity. *Hope v. Pelzer*, 122 S.Ct. at 2515; *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Officials can still be on notice that their conduct violates established law even in novel factual circumstances, and there is no requirement that previous cases be "fundamentally" or even "materially" similar. *Hope v. Pelzer*, 122 S.Ct. at 2516. Instead, the law merely must give defendants "fair warning" that their actions are unconstitutional. *Id*. In light of pre-existing law, the unlawfulness must be apparent. *Id*.; *Creighton*, 483 U.S. at 640, 107 S.Ct. 3034.

"In this circuit, the law can be 'clearly established' for qualified immunity purposes only by decisions of the United States Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." *Wilson v.*

*Strong*, 156 F.3d 1131, 1135 (11th Cir. 1998) (quoting *Jenkins v. Talladega City Bd. of Educ.*, 115 F.3d 821, 826 n. 4. (11th Cir. 1997)).

D.     **Conclusions of Law Regarding Material Facts**

There is no dispute that defendant White performed the alleged wrongful acts while acting within the discretionary authority of his employment. Defendant White maintains that he is entitled to qualified immunity because plaintiff has failed to establish that he committed a constitutional violation. The problem with White's argument is that his conclusion is based on <u>his</u> version of events. In analyzing whether White is entitled to qualified immunity, the court must take the "facts" in the light most favorable to the <u>plaintiff</u> and determine the legal issue of whether the plaintiff's "facts," if proven, show that this defendant violated clearly established law. *Priester v. City of Riviera Beach, Florida*, 208 F.3d 919, 925 n. 3 (11th Cir. 2000) (citing *Kelly v. Curtis*, 21 F.3d 1544, 1546 (11th Cir. 1994)).

White and plaintiff do not dispute plaintiff's version of events up to the time plaintiff was escorted to the medical department after declaring a medical emergency. These two parties <u>sharply</u> dispute, however, what occurred after plaintiff returned from the medical department. According to plaintiff, White commented that it did not appear plaintiff had gas, and that plaintiff looked as though he were going to die. Moments later, after Clark and Adams departed from plaintiff's dormitory, plaintiff complained to White that he again could not breathe. In response, White directed plaintiff to go to the bunk area and either stand or sit at a table. For the next 3-4 hours until the end of White's shift, White witnessed plaintiff sitting at the table, arms overhead, gasping for air. He also observed plaintiff lose consciousness 2-3 times and twice fall off his seat at the table only to be helped back to his seat by other inmates. White observed other inmates holding plaintiff's arms over his head when plaintiff was too exhausted to maintain that posture by himself, and heard inmates yell to him that plaintiff was dying and turning blue. White responded that plaintiff would be okay after his medicine took effect, knowing that it had been 2-3 hours since plaintiff took the antacid. In response to inmates yelling at him that plaintiff was dying and needed to go to the hospital, defendant White stood up, told everyone to "shut up," and stated, "I don't give a f___

if he drops dead. Its going to remain quiet in here." (Doc. 9, p. 7E). White then shook his head and sat down to his computer terminal. In contrast, defendant White asserts that he "ha[s] no recollection that Mr. Jeffries or any of the other inmates being held in the same barracks as Mr. Jeffries alerted me to any further medical emergency or problems involving Mr. Jeffries. (Doc. 113, White Aff. ¶ 6). These disputed facts are critical to plaintiff's claim. Taking the summary judgment evidence in the light most favorable to plaintiff, he has stated a constitutional violation.

"The next, sequential step [in the qualified immunity analysis] is to ask whether the right was clearly established." *Saucier v. Katz*, 533 U.S. at 201, 121 S.Ct. at 2156. The standard for determining whether a right is clearly established for purposes of qualified immunity is "whether the right violated is one about 'which a reasonable person would have known.'" *Goebert*, 2007 WL 4458122, at * 15 (citing *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738).

The Eleventh Circuit has recognized three sources of law that would put a government official on notice of statutory or constitutional rights: "specific statutory or constitutional provisions; principles of law enunciated in relevant decisions; and factually similar cases already decided by state and federal courts in the relevant jurisdiction." *Goebert*, 2007 WL 4458122, at * 15. The more general the statement of law, "the more egregious the violation must be before [a court] will find that the official is not entitled to qualified immunity." *Id.*

Here, there are principles of law enunciated in relevant decisions and factually similar cases previously decided by the Eleventh Circuit which clearly establish that defendant White's conduct amounted to deliberate indifference. The Supreme Court decision in *Estelle, supra*, established that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." *Estelle*, 429 U.S. at 104, 97 S.Ct. at 290 (internal citation omitted). The Eleventh Circuit has consistently held that knowledge of the need for medical attention and intentional refusal to provide it constitute deliberate indifference. *See Mandel v. Doe*, 888 F.2d 783 (11th Cir. 1989);

*Carswell v. Bay County*, 854 F.2d 454, 457 (11th Cir. 1988); *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985).

As for unnecessary delays in treatment constituting deliberate indifference, the Eleventh Circuit held in *Lancaster, supra,* that "an official acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition or an urgent medical condition that would be exacerbated by delay." *Id.*, 116 F.3d at 1425. However, "[t]his general statement of law ordinarily does not preclude qualified immunity in cases involving a delay in medical treatment. . . . The cases are highly fact-specific and involve an array of circumstances pertinent to just what kind of notice is imputed to a government official and to the constitutional adequacy of" the official's acts and omissions. *Bozeman*, 422 F.3d at 1274.

Defendant White's alleged inaction in this case is of the type that the Eleventh Circuit has held violates the clearly established right of prisoners to timely treatment for serious medical needs.  *See McElligott v. Foley*, 182 F.3d at 1260; *Harris v. Coweta County*, 21 F.3d at 394; *Brown v. Hughes*, 894 F.2d 1533 (11th Cir. 1990); *Mandel v. Doe*, 888 F.2d at 788-90; *Carswell v. Bay County, supra*.  The tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay.  One case which is sufficiently similar to have put White on notice that his inaction violated plaintiff's constitutional right is *Brown v. Hughes, supra*.

In *Brown*, a pre-trial detainee (Brown) was injured in a fight and suffered two broken bones in his left foot.  Just after the fight, Brown informed a jail officer that his foot hurt and was swollen, and that he thought it was broken.  *Id.*, at 1536.  The jail officer ignored Brown's complaint without explanation and, as a result, Brown was not given medical attention until four hours later.  By then, Brown's foot had become so swollen that the medical staff could not put a cast on it.  He had to wait eleven days before the inflammation abated to the point that he could be fitted with a cast.  *Id.*, at 1536, 1538-39.  The Eleventh Circuit held that these facts stated a constitutional claim of deliberate indifference against the jail officer.

Here, White deliberately and inexplicably ignored (for the approximate 3½ hours remaining on his shift), plaintiff's inability to breathe, his gasping for air, his repeated loss of consciousness, his maintaining a bizarre posture just to breathe, and the pleas of other inmates to get help. [24]  When White's shift ended, he mentioned nothing of plaintiff's condition to the relieving officer.  By the time plaintiff received medical attention another 3½ hours later, he required emergency surgery and an eleven-day hospital stay.  Like the jail officer in *Brown*, defendant White observed that plaintiff had a serious medical need that required attention, but he chose to completely ignore it.  A reasonable corrections officer would have known that this conduct was unlawful.  Defendant White is not entitled to qualified immunity.


## CONCLUSIONS

Based on the foregoing, the undersigned concludes that this action is not barred by *Heck v. Humphrey, supra*.  Defendant Sullivan is not entitled to summary judgment on plaintiff's excessive force claim, nor is he entitled to qualified immunity. The court reaches the same conclusion with respect to plaintiff's excessive force/failure-to-intervene claim against defendant Dix.

It is further concluded that defendant Clark is not entitled to summary judgment on plaintiff's medical care claims.  Defendant Adams, however, is.

Defendant PHS is entitled to summary judgment on all of plaintiff's medical care claims, with the exception of his claim of a custom or policy of providing cheaper but less efficacious treatment.  PHS is not entitled to Eleventh Amendment immunity.

Finally, the court concludes that defendant White is not entitled to summary judgment on plaintiff's claim of deliberate indifference, nor is he entitled to summary judgment based on qualified immunity.

---

[24]Plaintiff was returned to his dormitory at approximately 3:30 a.m.  White's shift ended at 7:00 a.m.  (Doc. 113, White Aff., p. 2 ¶ 2).  Plaintiff was taken back to the medical department at approximately 10:30 a.m.  (*Id*., p. 8).

Accordingly it is respectfully RECOMMENDED:

1.  That defendants Sullivan's and Dix's motions for summary judgment (docs. 72, 73) be DENIED.

2.  That defendant Clark's motion for summary judgment (doc. 109) be DENIED.

3.  That defendant Adams' motion for summary judgment (doc. 110) be GRANTED.

4.  That defendant Prison Health Services' motion for summary judgment (doc. 71) be GRANTED IN PART AND DENIED IN PART as follows:

    a.  That the motion be DENIED as to the issue of whether PHS had a custom or policy of providing cheaper but less efficacious medical treatment that resulted in deliberate indifference to plaintiff's serious medical needs.

    b.  That the motion be DENIED with regard to PHS' assertion that it is entitled to Eleventh Amendment immunity from plaintiff's monetary damages claims.

    c.  That the motion be GRANTED in all other respects.

5.  That defendant Robert White's motion for summary judgment (doc. 117) be DENIED.

6.  That this matter be referred to the undersigned for further proceedings.

At Pensacola, Florida this 22nd day of January, 2008.

/s/ *Miles Davis*

**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).**